UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

DETROY LIVINGSTON,

                Plaintiff,

         vs.

P. GRIFFIN, Correction Captain, State of
New York Correctional Services (DOCS);
DONALD SELSKY, Director of Special
Housing for DOCS; R. LEE, Correction
Officer (C.O.); S. HURTEAU, C.O.; S.
GAWLICKY C.O.; LEFRANCE, Sergeant
of DOCS; M. FOSTER, C.O.; D. ABAIR,
C.O.; S. SALLS, Sergeant of DOCS; J.
BOUYEA, C.O.,

                Defendants.

No. 9:04-cv-00607-JKS

MEMORANDUM DECISION
and ORDER
[Re: Motion at Docket 56]

## I.  MOTION PRESENTED

At Docket No. 56 defendants P. Griffin, Donald Selsky, R. Lee, Scott Hurteau, S.
Gawlicky, G. LeFrance,[1] M. Foster, D. Abair, S. Salls and J. Bouyea have moved for summary
judgment in their favor under FED. R. CIV. P. 56.  At Docket No. 62 Plaintiff Detroy Livingston
has opposed the motion to which Defendants replied at Docket No. 66.  After reviewing the
moving and opposing papers the Court has determined that the issues are fully briefed and oral
argument would not assist the Court in ruling on the motion.  The matter is decided on the
moving and opposing papers.

## II.  BACKGROUND/JURISDICTION

Plaintiff Detroy Livingston ("Livingston") is an inmate in the custody of the New York
Department of Correctional Services ("DOCS") incarcerated at the Coxsackie Correctional

---

[1] In various documents filed with the Court, "LeFrance" is spelled "LaFrance."  For purposes of
consistency the Court will use the LeFrance spelling in this memorandum decision and order.

Facility, Coxsackie, New York.  Defendants P. Griffin ("Griffin"), Donald Selsky ("Selsky"), R. Lee ("Lee"), Scott Hurteau ("Hurteau"), S. Gawlicky ("Gawlicky"), G. LeFrance ("LeFrance"), M. Foster ("Foster"), D. Abair ("Abair"), S. Salls ("Salls") and J. Bouyea ("Bouyea") are all employees of DOCS in various capacities.  Livingston, appearing *pro se*,  has sued all the defendants in their individual capacities under 42 U.S.C. § 1983 alleging various violations of his civil rights under the Constitution and laws of the United States in 17 causes of action.  These causes of action are divided into seven separate claims at three separate correctional facilities.

In his first count, Livingston sets forth his first four causes of action alleging that Griffin denied him due process of law under the Sixth and Fourteenth Amendments arising out of a disciplinary hearing.  Livingston's fifth cause of action, contained in his second count, alleges that Selsky in reviewing and modifying the disposition of the disciplinary action also violated his due process rights under the Sixth and Fourteenth Amendments.  The third count contains the sixth and seventh causes of action alleging that Lee inflicted cruel and unusual punishment on him in violation of the Eighth and Fourteenth Amendments as well as violated New York law by feeding him foods mixed with unknown drugs.  Livingston's fourth count contains Livingston's eighth and ninth causes of action alleging that Hurteau inflicted cruel and unusual punishment on him in violation of the Eighth and Fourteenth Amendments as well as violated New York law by feeding him foods mixed with unknown drugs.  In his fifth count Livingston sets forth his tenth, eleventh, and twelfth causes of action alleging that Gawlicky fabricated a misbehavior report subjecting him to cruel and unusual punishment in violation of Fifth, Eighth and Fourteenth Amendments and provided false testimony that resulted in a violation of the Sixth and Four-teenth Amendments.  In the sixth count, Livingston's thirteenth cause of action alleges that LeFrance tried to force him to be chained to a transsexual/homosexual contrary to Livingston's religious beliefs in violation of First and Fourteenth Amendments and the fourteenth cause of action alleges that Foster fabricated a misbehavior report arising out of his refusal to be transported while chained to a transsexual/homosexual in violation of his First and Fourteenth Amendments.  Livingston's seventh count contain Livingston's fifteenth, sixteenth, and seventeenth causes of action alleging that Abair, Salls, and Bouyea, respectively, denied him religious meals in violation of the First, Eighth, and Fourteenth amendments.

This Court has jurisdiction over the federal constitutional claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

## III.  ISSUES PRESENTED

Defendants' Motion raises essentially two issues: (1) that there is insufficient evidence to support any of the claims made and (2) defendants Griffin, Selsky, Foster, LeFrance, Salls, Abair, and Bouyea are entitled to qualified immunity.

The claims under Count One and the Second Count raise the issue of the due process requirements in prisoner disciplinary actions to (1) compulsory production of witness; (2) the extent to which documentary evidence used by the hearing officer in making his decision must be provided to the prisoner; and (3) whether a recording of the proceedings is constitutionally mandated.

The claims under the Third and Fourth Counts raise the issues of (1) whether expert testimony is required to establish a claim that food fed to an inmate was drugged and (2) whether a private cause of action exists for a violation of the New York penal Code.

The Fifth Count deals with the issue of whether temporal proximity between the filing of a complaint against a correctional officer and an adverse action (issuance of a misbehavior report), standing alone, is sufficient evidence to survive a summary judgment motion on a retaliation claim.

The Sixth Count presents the issue of whether a sincerely held religious belief that homosexuality is an abomination justifies a refusal to be shackled to or be compelled to sit next to a transsexual/homosexual individual.

The Seventh Count presents an issue of whether a prisoner's dietary restrictions must be central to his religious beliefs.

## IV.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if, when viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment in its favor as a matter of law.  FED. R. CIV. P. 56(c); *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.2000).  Support and opposition to a motion for summary judgment is made by affidavit made on personal knowledge of the affiant, depositions, answers

to interrogatories, setting forth such facts as may be admissible in evidence. FED. R. CIV. P. 56(e).  "A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995); *see also* 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. AND PROC. CIV. (3rd) § 1339 (noting that a verified pleading may serve as an affidavit only if it contains facts known to be true in the affiant's own knowledge and if it has a certain level of factual specificity).

In response to a properly supported motion for summary judgment, the opposing party must come forth with evidence that would be sufficient to support a jury verdict in his favor at trial. *Colon v. Coughlin, supra*; *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995).[2/]  The issue of material fact required to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.  In order to show that a genuine issue of material fact exists a nonmoving plaintiff must introduce probative evidence that establishes the elements of the complaint.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment."  *Id.*, at 255.  All reasonable inferences are drawn in favor of the non-moving party and the moving party bears the burden of both production and persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986).  There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Additionally, *pro se* litigants should generally be afforded "special

---

[2/] The Court notes that in their motion Defendants offer DOCS records that although authenticated by counsel are not properly authenticated by the custodian of records.  However, Plaintiff has not objected to their use and their admissibility at trial is not subject to dispute.  Consequently, the Court will consider the records. *See H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454–55 (2d Cir.1991).

solicitude" regarding motions for summary judgment. *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir.1988).[3]

## V.  DISCUSSION

A.  **Denial of Due Process Claims (Count One – Griffin; Second Count – Selsky)**.

The basic facts underlying these claims is not disputed.  On November 27, 2001, Livingston was issued a misbehavior report charging him with violating prison rules 100.11 (assault on staff) and 106.10 (direct order).  Griffin conducted a disciplinary hearing on November 30, December 5, and December 8, 2001.  Livingston's defense was that the C.O. assaulted him by pushing him down the stairs.[4]  Eight witnesses testified at the hearing, one inmate witness refused to testify, and Griffin denied Livingston's request to call the facility doctor as a witness.  Livingston was provided a copy of the denial of witness form.  Livingston was furnished and submitted a redacted copy of the unusual incident report and the officers' "To/From" forms, which comprise the report.  Following the hearing, Livingston was found guilty and sentenced to 36 months in the special housing unit ("SHU").  Livingston appealed the guilty disposition and sentence to Selsky, Director of Special Housing/Inmate Disciplinary Program. Selsky affirmed the guilty disposition, but modified the sentence imposed to 12 months in the SHU.

Livingston alleges that Griffin violated his Sixth and Fourteenth due process rights by: (1) failing to call witnesses; (2) taking testimony off the record; (3) denying Livingston documentary evidence; (4) failing to personally ascertain whether an inmate witness in fact refused to testify and failing to provide him with the refusal to testify form; and (5) knowingly used a defective tape recorder.  With respect to Selsky, Livingston alleges that, notwithstanding the reduction in the sentence to the SHU, in affirming the finding of guilt notwithstanding the due process violations, Selsky also violated Livingston's Sixth and Fourteenth Amendment due process rights.

---

[3] The Court need not, however, accept conclusory statements or allegations. *Davis v. New York*, 316 F.3d 93, 100 (2d Cir.2004).

[4] The C.O. who filed the complaint against Livingston, T. Notobartolo, is not a party to this lawsuit.

In his complaint Livingston alleges:

20. On November 30, 2001 Plaintiff informed defendant P. Griffin that he wanted to call all the c.o.'s as witnesses that responded to the incident because he did not know their names.

21. Defendant P. Griffin failed to call but four of the c.o.'s that responded to the incident.

22. There was over ten c.o's that responded to the November 26, 2001 incident.

23. C.O. Keller witnessed part of the incident and he gave defendant P. Griffin the name of another C.O. that responded to the incident during a off-the-record testimony which Plaintiff over heard.

24. When Plaintiff requested the C.O. whose name c.o. Keller gave to defendant P. Griffin to be call as a witness he refused to call him or disclose the name.

25. Defendant P. Griffin's off-the-record testimony violated Title 7 NYCRR §254.6(b).

26. Defendant P. Griffin denied Plaintiff the injury report of C.O. T. Notobartolo concerning the November 26, 2001 incident.

27. Defendant P. Griffin denied Plaintiff the institution doctor as a witness at the hearing.

28. Defendant P. Griffin did not personally ascertain whether inmate Shabazz in fact refused to testify at the hearing, and place his findings on the record.

29. Defendant P. Griffin did not furnish Plaintiff with any of the forms to explain the refusal of witnesses, refusal to testify, nor denial of documentary evidence.

30. Defendant P. Griffin refused Plaintiff the Unusual incident report, and accident reports even though he promised that he will.

31. Defendant P. Griffin knowningly [*sic*] used a defective tape recorder which did not clearly record Plaintiff's objections and conclusions.

The minimum due process requirements for prison disciplinary proceedings were laid down by the United States Supreme Court more than 30 years ago in *Wolff v. McDonnell*, 418 U.S. 539, 563–71 (1974). Summarized, these include: (1) written notice of the charges; (2) sufficient time to marshal the facts and prepare a defense; (3) a limited or restricted right to call witnesses and present documentary evidence; and (4) a written statement by the fact finder as to the evidence relied upon and the reasons for the disciplinary action. Prison officials have the discretion to keep to keep a disciplinary hearing within limits and refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as limit the access to other inmates

to collect statements or compile documentary evidence.  Although not prescribed, it is useful for the reason for refusal to call a witness to be stated.  Confrontation and cross-examination are not constitutionally required.  Nor does the inmate have a right to counsel; however, where an illiterate inmate is involved or the complexity of the issues render it unlikely the that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff.

Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence that supports the decision to impose discipline on the inmate.  Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. *Superintendent, Mass. Correctional Inst. v. Hill*, 472 U.S. 445, 454–55 (1985).

The ordinary disciplinary procedures of the New York prison system comport with the appropriate due process standards outlined in *Wolff. See Walker v. Bates*, 23 F.3d 652, 656 (2d Cir.1994).  In a § 1983 civil rights action, the only relevant inquiry is whether the constitutional minimal requirement for imposing disciplinary punishment was met, not whether state procedures were followed. *Shakur v. Selsky*, 391 F.3d 106, 118-19 (2d Cir.2004).  The record in this case clearly establishes that Plaintiff's constitutional due process rights were satisfied.  Of the rights recognized in *Wolff* only the right of right to call witnesses and present documentary evidence is implicated in this case.

The Court notes initially that, with respect to the disciplinary charge, only Plaintiff and C.O. T. Notobartolo were present during the altercation on the stairs.  At the disciplinary hearing the two gave diametrically opposed versions of what occurred.  According to the testimony of Notobartolo while he was escorting Livingston down the stairs Livingston turned and punched him in the side of the face.  Notobartolo then grabbed Livingston in a bear hug in an upper body hold and the two tumbled down the stairs.  After scrapping for a while, Notobartolo gained

control of Livingston, rolled him over face forward, put his knee on Livingston's buttocks and held him while two other officers applied mechanical restraints.  Livingston testified that Notobartolo pushed him down the stairs and that, while holding him down, Notobartolo mouthed to an unidentified officers to hit him (Notobartolo) in the face, which the unidentified officer did.

The two inmate witnesses testified as to what they observed prior to the time Notobartolo and Livingston entered the stairwell but did not observe what occurred in the stairwell.  None of the other four correctional officers who testified, all of whom arrived on the scene after Notobartolo had regained control of Livingston in the stairwell, corroborated Livingston's testimony concerning the officer who allegedly was requested to and did hit Notobartolo.

Turning first to the unidentified C.O. who was not called (¶¶ 23 and 24).  A review of the transcript and Livingston's statement of facts simply do not support the speculative and conclusory allegation that Griffin Keller identified the C.O. Livingston believes was present. Livingston was permitted to call every C.O. identified either by testimony or in a report submitted.  Keller testified that he, Sgt. Shanley, C.O. Kukla, and an unidentified C.O. responded to the scene.  C.O. Kukla testified that he, C.O. Keller, and C.O. Notobartolo were present and that C.O. Hemeon came later.  Sgt. Shanley testified that he came on the scene after Livingston was under control.  Griffin explained that he was unable to learn the identity of the C.O., which is clearly a valid reason for not calling the witness.  Livingston's position in this case would go further and require Griffin to prove that he was unable to learn the identity.  This, the Court may not do. *See Freeman v. Rideout*, 808 F.2d 949, 954 (2d Cir.1986) citing *Ponte v. Real*, 471 U.S. 491, 497 (1985).  Moreover, while due process requires that an inmate be permitted to call witnesses in his defense, there is no authority for the proposition that due process requires the hearing officer to identify and locate witnesses for the inmate.

With respect to the recording allegations (¶¶ 25 and 31) due process does not require that the proceedings be recorded.  Accordingly, while it may be contrary to New York law, the failure to record a part of the proceeding or use a defective recorder that does not accurately record the entire proceeding does not violate constitutional due process.

As the hearing officer (Griffin) explained in denying access to C.O. Notobartolo's injury report (¶ 26), those records are confidential.  Their relevance to the disputed issues is, at best, tangential.  The extent of the injuries Notobartolo may have suffered was not at issue. Livingston does not cite and the Court's independent research does not reveal any authority for the proposition that, in the context of the disputed issues involved in this case, Livingston was entitled to see that report.  Griffin also adequately and properly explained his denial of Livingston's request to call the institution doctor (¶ 27), *i.e.*, that testimony of the doctor, who was not at the scene and did not witness the incident, was irrelevant.  All the institutional doctor could have testified to was the extent of Livingston's injuries, not how he incurred them.  The Court notes that the injuries Livingston suffered were, by his own admission, as a result of falling down the stairs.  Whether he was pushed, as Livingston alleges, or was grabbed and fell in the grasp of Notobartolo as Notobartolo alleges, is not a matter to which the doctor could competently testify.  Since the refusal to call the doctor was based upon irrelevance, that refusal was justified and did not violate constitutional due process. *Kingsley v. Bureau of Prisons,* 962 F.2d 145, 146–47 (2d Cir.1992).

With respect to the testimony of Shabazz (¶ 28), the hearing transcript shows that Griffin received the refusal form signed by Shabazz that he would not testify and heard the testimony of the C.O. who obtained and witnessed the signed refusal to testify form.  Due process does not require, as Livingston suggests, that the hearing officer personally ascertain that a witness refuses to testify.

Finally, turning to Griffin's refusal to furnish the forms and denial of documentary evidence,[5] the unusual incident, and accident reports (¶¶ 29 and 30).[6]  Livingston complains he was not furnished the refusal to testify form signed by Shabazz and an unredacted copy of the unusual incident report.  The material redacted from the unusual incident report was a portion of a sentence that described the injuries received by Notobartolo.  That was properly withheld from Livingston for the same reason as was the injury report.  As for the refusal to testify form is

---

[5] Livingston does not identify what other documentary evidence he was denied.

[6] The accident report is the injury report referred to in ¶ 26 and disposed of above.

concerned, as noted above, the hearing officer received the form and heard testimony concerning how it was obtained and signed.  Even assuming that not giving it to Livingston (the transcript does not indicate that he requested a copy or to examine it) constituted a denial of due process, it was harmless.  Livingston merely complains that he was not provided a copy of the refusal form but does not contend that Shabazz did not refuse or even make any offer as to what the testimony of Shabazz might be or what disputed issue of fact to which it might related.

Livingston's constitutional due process rights were not violated by either the Tier III hearing by Griffin or its review by Selsky.  Moreover, with respect to Selsky, Livingston has failed to provide facts that even hint at, let alone establish, Selsky had a personal involvement in the alleged denial of his constitutional due process rights. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994).  Although he alleges that the complaint by the C.O. was "fabricated," the record contains ample evidence to support the finding that Livingston was guilty of the infractions of which he was charged.  Griffin is entitled to judgment in his favor on Count One (First, Second, Third, and Fourth Causes of Action) and Selsky is entitled to judgment in his favor on the Second Count (Fifth Cause of Action).

## B. **Cruel and Unusual Punishment – Food Drugging (Third Count – Lee; Fourth Count – Hurteau)**.

Livingston contends that on various dates in July 2002 Lee and Hurteau knowingly, intentionally, and deliberately served him food trays laced with unknown drugs.  As a result each time Livingston ate the food he became dizzy, light headed, disoriented, sleepy and rendered unconscious.  Livingston also contends that he had to file a felony complaint before the poisoning of his food ceased.  In his Affidavit, Livingston states:

> 14.    Defendant R. Lee knowingly gave Plaintiff food trays with some kind of drugs mixed into the food. Plaintiff was poisoned by defendant Lee on July 15, 16, 17, 21 and 29, 2002. Each time Plaintiff ate the food defendant Lee gave him the drug made him dizzy, lightheaded, disorientated, sleepy and rendered unconscious. That is how Plaintiff realized that defendant Lee was poisoning him through the food tray.

> 15.    The poisoning of Plaintiffs food started after he wrote some complaints and grievances on defendant Lee. The first grievance Plaintiff wrote on defendant Lee was that he refused to pick up his mail, and the next was in regard to him not giving Plaintiff his law library request. Plaintiff did not

have any problem with defendant Lee before these instances. Nor was Plaintiffs food poisoned until after he wrote the grievances and complaints against defendant Lee. The poisoning of Plaintiffs was done in retaliation for writing grievances and complaints against defendant Lee.

16.    When defendant Lee gave Plaintiff his food tray he would make sarcastic remarks about the food like, "don't forget to eat your vegetables, it's good for you", and "I put something good for you in there." Plaintiff did not really know what defendant Lee meant by these remarks until after he ate the food, and felt the effects of the poison.

17.    Plaintiff complaint numerous times about defendant Lee poisoning his food. Plaintiff went as far as filing a felony complaint against defendant Lee in an attempt to stop him from poisoning his food.

18.    Plaintiff also tried to get medical tests performed to figure out what was causing the dizziness, disorientation and unconsciousness after he ate the food. Nurse Gomez did not have any medical tests done when Plaintiff requested them, and complained about the effects of the poisoned food to him.

19.    Defendant S. Hurteau also knowingly and deliberately gave Plaintiff poisoned food. On July 23, and September 4, 2002 defendant Hurteau deliberately gave Plaintiff food trays in which unknown drugs were mixed into the food. Each time Plaintiff ate the food defendant Hurteau gave him the drugs made him dizzy, lightheaded, disorientated, sleepy and rendered unconscious.

20.    Plaintiff was being poisoned by defendant Hurteau, because of the griev-ances he wrote on him. Plaintiff had written a couple of grievances on defendant Hurteau for breaking the cell headphones and then writing him a misbehavior report for breaking the headphones.

21.    At no time did Plaintiff consent to have drugs planted in his food by defendant Hurteau, or anyone else. Nor did a medical doctor authorize drugs to be put in Plaintiff's food by defendant Hurteau, or anyone else. Plaintiff was taking medication for a chronic illness at the time that his food was being poisoned by defendant Hurteau, but the medication did not cause any vertigo, unconsciousness, or dizziness. It was the unknown drugs that were in the food that cause these effects in Plaintiff.

22.    Plaintiff had to resort to filing a felony complaint on defendant Hurteau for poisoning his food for the violation to stop.

23.    Plaintiff told the other prisoners in his area that sometimes when he ate the food he felt the effects of being drugged. Some of these prisoners also told Plaintiff that they also felt drugged up after eating the food.

24.      Plaintiff loss 50 pounds because defendants Lee and Hurteau were poison-
ing his food and he was in fear of eating the food.

In his deposition with respect to Lee, Livingston testified:

Q        How do you know Defendant Lee put drugs in your food?

A        Because sometime he will say something to the effect of eat --
don't forget to eat your vegetables, and it's good for you, and I put something
good for you in there and stuff like that.

Q        Did he tell you he put drugs in your food?

A        Not, not like that. He didn't come outright and say there's drugs in
your food poisoning you. He would say some sarcastic things like I put something
good in there, and don't forget to eat your vegetables and stuff like that.

Q        What made you think that those comments reflected that Defen-
dant Lee put drugs in your food?

A At first I didn't -- when he said it, I didn't 24 think -- you know, he was
just talking. But after eating it, then I feel the effect of the drugs, then I knew
what he's doing -- what he meant by what he said.

Q        And what effects are you referring to?

A        I would get lethargic, sleepy, dizzy, and I 4 would sometimes fall
out -- go to sleep.

Q        Why would Defendant Lee put drugs in your food?

A        Retaliation.

Q        For what?

A        For writing him up.

Q        When did you write him up?

A        While I was there. I don't remember the dates, but I wrote him up
about not. giving me my law library and stuff like that.

Q        Are you referring to formal grievances that you wrote?

A        Formal grievances and complaints that the Superintendent was
provided.

With respect to Hurteau, Livingston testified:

Q        And how do you know Defendant Hurteau put drugs in your food?

A        Because he was the one that was giving me that food, that specific
tray right there, and he had an ax to grind or something to retaliate against me for
writing him up and . . .

Q      And how do you know those two trays had drugs in it?

A      After eating it, I felt the effects of the poison.

Lee and Hurteau do not contradict the facts asserted by Livingston.  Instead they rely on the perceived weaknesses in his case.  Contrary to the arguments of Lee and Hurteau, Livingston's medical records for July 24, 2002, reflect: "When I been eating food in the last month I've been feeling dizzy, light headiness, sleep, I want to take [illegible writing] see why this is happening" and the notation under "Plan" "Ɵ: Thinks it the food – Discuss [medical symbol for with] PA."  Although Livingston's medical records show several visits with medical personnel in the month following his initial complaint, the record does indicate any further investigation of Livingston's complaints was undertaken.  Lee and Hurteau also argue that because Livingston has no expert medical testimony to establish a causal connection between his alleged health ailments and the alleged drugs in his food and the cause of the injury is not within common knowledge of a layperson, his claim must fail, citing *Wills v. Amerada Hess Corp*., 379 F.3d 32, 46 (2d Cir.2004) and *Barnes v. Anderson*, 202 F.3d 150, 159 (2d Cir.1999).

Neither *Wills* nor *Barnes* is apposite to this case.  In *Wills* the issue presented was  the causal connection between squamous cell carcinoma and exposure to benzene or PAHs.  *Barnes* presented the issue of the causal connection between a miscarriage and an incident that was alleged to have caused substantial emotional stress.  This case, on the other hand, involves a situation in which it is uncontested that Livingston ingested food provided him by Lee and Hurteau and after ingesting the food became dizzy, lightheaded, disorientated, sleepy and rendered unconscious.  No medical or laboratory  tests were run on Livingston.  Under these circumstances it is impossible to determine from direct objective evidence what, if any, foreign substance adulterated the food he ingested.  Without this critical information it would not be possible for a medical expert to testify with any reasonable degree of medical certainty the cause of  the symptoms exhibited by Livingston.  At best, a medical expert could only provide the trier of fact with a list of those substances that, when added to food, (1) would not necessarily be readily detectable while it was being eaten and (2) would cause similar symptoms to occur.  The facts in this case are more akin to an ordinary food poisoning case.  It is within common knowledge that when one eats contaminated food and suffers food poisoning one becomes ill.

The severity of the illness may be dependent upon the exact nature of the contaminant but irrespective of the contaminant the person who ingests contaminated food suffers to some degree from food poisoning.  In this case, if the jury accepts Livingston's claim that Lee and Hurteau drugged or poisoned the food he was served, the causality nexus between that and the ensuing symptoms may be logically inferred from temporal proximity.

A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir.1999).  The subjective component of the claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness'" in light of the particular circumstances surrounding the challenged conduct. *Blyden v. Mancusi,* 186 F.3d at 262 (quoting *Wilson v. Seiter,* 501 U.S. 294, 299 (1991)); *see, e.g., Davidson v. Flynn,* 32 F.3d 27, 30 & n. 2 (2d Cir.1994).

Administering a harmful foreign substance through food causes bodily injury just as does the use of excessive force.  In an excessive-force case, whether conduct was "wanton" turns on whether force was applied in a good-faith effort to further a legitimate penal objective, or maliciously and sadistically to cause harm. *Hudson,* 503 U.S. at 7; *see also Blyden v. Mancusi,* 186 F.3d at 262-63.  Applying that principle to the uncontested facts of this case, the deliberate adulteration of food without any connection whatsoever to a legitimate penological objective, a rational jury could reasonably find that the actions of Lee and Hurteau were wanton.

The objective component of a cruel-and-unusual-punishment claim focuses on the harm done; but the amount of harm that must be shown depends on the nature of the claim. *See, e.g., Hudson,* 503 U.S. at 8.  This objective component is "contextual and responsive to contemporary standards of decency," *id.* (internal quotation marks omitted), and there are significant differences between the harm that must be shown to support a claim based on prison conditions and the harm that will suffice to support a claimed use of excessive force.  No showing of extreme injury is required when the claim is that prison officials used excessive force:

> In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary

standards of decency always are violated· · ·.  This is true whether or not signifi-
cant injury is evident.

*Hudson,* 503 U.S. at 9.  Applying that principle to the facts in the case before the Court, a
rational jury could reasonably find that the deliberate inclusion of a harmful substance in food
and serving it to a prisoner was done maliciously and sadistically intending to cause harm,
thereby violating contemporary standards of decency.  In that case, irrespective of whether Lee
and Hurteau, or either of them, intended to cause Livingston serious bodily harm or death and
only to make him ill, they subjected him to cruel and unusual punishment.

  Based on the undisputed facts in the record before it the Court can not say that a rational
jury could not reasonably find in favor of Plaintiff.  The Court agrees that there is no direct
objective evidence corroborating Livingston and the circumstantial evidence is weak.[7]  Nonethe-
less, a jury could find, based upon the uncontradicted testimony of Livingston that he ingested
food and became ill shortly thereafter, in the absence of any other plausible cause, more likely
than not he became ill because of some harm substance added to the food.  The jury could also
find that Lee and Hurteau had both the opportunity (as the persons who delivered the food) and
the motive (retaliation) to place a harmful substance in the food.[8]

  In his Seventh and Ninth Causes of Action Livingston alleges that the acts of Lee and
Hurteau violated N.Y. PEN. LAW §120.05(5) (Assault in the second degree).   Defendants argue
that Livingston lacks standing to bring the claim citing *Leeke v. Timmerman*, 454 U.S. 83, 91
(1981).  While the Court agrees that Livingston lacks standing to bring a criminal action, that is
not the issue.  The issue, as it relates to N.Y. PEN. LAW 120.05(5), is whether it gives rise to a

---

  [7]  In the context of a summary judgment motion, not only must the Court accept as true the
factual assertions of the non-moving party, but in this case neither Lee nor Hurteau have denied under
oath Livingston's factual statements that they served him drugged, poisoned, or otherwise contaminated
or adulterated food.

  [8] To the extent that Livingston asserts a retaliatory animus claim based on temporal proximity to
previously filed grievances against Lee and Hurteau, strength of temporal proximity weighs greater than
that of the claim against Gawlicky discussed below.  The issuance of an inmate misbehavior report is a
normal function of a correctional officer entitled to a presumption of regularity.  On the other hand,
spiking an inmate's food with drugs, poison, or another harmful substance is most decidedly not.
Moreover, unlike the claim against Gawlicky, Lee and Hurteau have as yet presented no evidence to
counter its weight.

private cause of action under New York law.  Defendants have not cited any case that no private cause of action lies for a violation of that provision and independent research by the Court has not found any such authority.  It is clear that New York recognizes the existence of a private cause of action for violations of its Penal Law. *Burns Jackson Miller Summit & Spitzer v. Lindner*, 451 N.E.2d 459, 463 (N.Y.1983).  Under New York law, as applied by the New York Court of Appeals, unless the legislature specifically provides that the provisions of the penal law are exclusive and private litigants are not intended to have a cause of action for its violation, it is for the courts to determine, in light of statutory provisions, particularly those relating to sanctions and enforcement, and their legislative history, and of existing common-law and statutory remedies, whether legislature intended private litigants to have cause of action for violation of provisions. *Id.*  Whether a private cause of action was intended under a penal statute turns in the first instance on whether Livingston is one of the class for whose especial benefit statute was enacted.  However, inquiry does not end there, rather, factors include what indications there are in statute or its legislative history of intent to create or deny such remedy and, most importantly, consistency of doing so with purposes of underlying legislative scheme. *Id.* Although they have the burden of establishing entitlement to judgment as a matter of law, Lee and Hurteau have not briefed this critical issue.

Additionally, it appears that New York would recognize a civil tort cause of action under the facts of this case. *Cf. McCrory v. State*, 721 N.Y.S.2d 712, 713 (N.Y.A.D.2001) (dismissing food poisoning claim for failure to prosecute); *Hakeem v. Wong*, 636 N.Y.S.2d 440, 441 (N.Y.A.D.1996) (dismissing a prisoner's claim that prison officials deliberately poisoned foods purchased from a vending machine for failure to exhaust administrative remedies).  In addition, the Second Circuit has indicated that a civil battery claim lies under N.Y. PEN. LAW § 35.30.  *See Nimely v. City of New York*, 414 F.3d 381, 391 (2d Cir.2005).  This Court perceives no principled reason to assume that a civil battery claim may not be asserted under § 120.05(5).

Having failed to establish that they are entitled to judgment in their favor as a matter of law, Lee and Hurteau are not entitled to judgment on Count Six (Sixth, Seventh, Eighth, and Ninth Causes of Action).

C. **False Misbehavior Report (Fifth Count – Gawlicky)**

The basic facts of the events and sequence in this case are undisputed.  Livingston lodged complaints with the Superintendent against Gawlicky on March 17 and April 6, 2003.  On April 11, 2003, Gawlicky issued a misbehavior report against Livingston charging him with making threats against her and disobeying a direct order.  Following a hearing, Livingston was found guilty of making of the threat charge and not guilty of violating a direct order and sentenced to four months punitive confinement, with loss of privileges.

Livingston contends that the report was false and Gawlicky fabricated it in retaliation for Livingston having filed the complaints against her and that she falsely testified that she feared Livingston might reach through the cell bars to assault her so that he would be placed in a plexi-glass cell.

Because they involve questions of intent and are easily fabricated and pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, courts must approach prisoner claims of retaliatory action with skepticism and care. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).  To sustain a First Amendment retaliation claim Plaintiff must show that: (1) the speech or conduct at issue was protected; (2) the defendant took an action adverse to him; and (3) a causal connection between the protected speech or activity and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir.2004); *Dawes v. Walker,* 239 F.3d at 492.  Defendant concedes that the complaints filed by Livingston constituted a protected activity and it appears beyond cavil that the filing of a misbehavior report that results in disciplinary action is adverse. *See, e.g., Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996).  This leaves as the only open issue the causal connection between the two.

The only evidence that Livingston offers for his retaliation claim is the temporal proximity between his complaints against Gawlicky and the filing of the disciplinary charges against him.  This is circumstantial evidence of retaliation. *See Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir.2002); *Colon v. Coughlin, supra,* 58 F.3d at 872.  The question becomes whether this, standing alone, is sufficient to defeat summary judgment.  In *Colon* the Second Circuit suggested that if this were the sum and total of plaintiff's case, it might be inclined to affirm the

grant of summary judgment to the defendants based upon the weakness of plaintiff's case. 58 F.3d at 873.  In this case, unlike *Colon*, Livingston offers no direct evidence of a retaliatory motive.  Other circumstantial evidence that might lend support to his case, *e.g.*, his disciplinary record and the nature of the more recent disciplinary violations, *see Flaherty v. Coughlin*, 713 F.2d 10, 14 (2d Cir.1983), in reality undercut Livingston's claim.  The record shows that between December 1989 and April 2003 Livingston was the subject of more than 100 disciplinary actions, several of which involved assaults on or threats made to staff.  In *Gayle*, unlike this case, the misbehavior report was not only temporally close but arose from statements made in a protected activity (discussion of a grievance) and the conviction was reversed on appeal.

The Court, balancing the principles of the special solicitude to be given to *pro se* plaintiffs and the general rule against weighing the evidence against the skepticism with which it must view retaliation claims, is of the opinion that, based on the evidence in this case, no rational trier of fact could reasonably find in favor of Livingston.  Gawlicky is entitled to summary judgment in her favor on the Count Five (Tenth, Eleventh, and Twelfth Causes of Action).

D. **Interference with Religious Beliefs (Count Six – LeFrance and Foster; Count Seven – Abair, Salls, and Bouyea**).

Both Count Six and Count Seven appear to be predicated upon an alleged infringement of Plaintiff's religious beliefs as a Rastafarian.  In his complaint, Livingston alleges that LeFrance tried to force him to be handcuffed or sit next to a person who was clearly a transsexual/homosexual and that because of this Foster fabricated a misbehavior report that Livingston disobeyed a direct order.  He further alleges that Abair, Salls and Bouyea refused to serve him alternative religious meals, *i.e.*, substitute meals when red meat was served.  Livingston's claim of religious belief is clouded by certain undisputed facts.  Livingston admits to having been raised as a Seventh Day Adventist.  In approximately 1984 he became a Muslim.  At some subsequent date that does not appear in the record, Livingston converted to Rastafarianism.   However, irrespective of the date of his conversion, Livingston did not inform prison officials of this conversion until on or after August 21, 2004, after the dates that the events of which Livingston complains occurred.

1. *LeFrance and Foster.*

In his affidavit, Livingston  testified:

38. On July 21, 2003 when Plaintiff was being transferred out of Upstate C.F. SHU, defendant LaFrance tried to force him to be shackled with an inmate that was clearly a transsexual/homosexua1. Due to Plaintiffs religious belief he refused to be shackled with the transsexual/homosexual inmate.

39. When Plaintiff was called to the pen gate to be shackled, and he saw the inmate whom was to be shackled with him Plaintiff calmly asked defendant LaFrance, "is this person going to be handcuffed to me". Defendant LaFrance answered "yes". That is when Plaintiff clearly, calmly and respectfully told defendants LaFrance, M. Foster, and the other c.o.'s in the area that it's against his religion to be in such a close proximity with a transsexual/homosexual person, and could he be shackled to somebody else. The defendants said "no". Plaintiff then sat beck [*sic*] down.

40. Plaintiff was again asked to be shackled to the transsexual/homosexual inmate. Plaintiff again refused to be shackled to that inmate, and again stating his religious concerns.

41. Defendant LaFrance then got on the telephone and spoke to someone about Plaintiff and the situation. While on the telephone defendant LaFrance suggested an alternative solution to the situation. The alternative was that Plaintiff would not be shackled to this person, but he still had to be seated next to the same person, Plaintiff agreed to not being shackled to this person, but questioned the logic of being forced to being seated next to this person still. Defendant LaFrance then told the person on the telephone that Plaintiff still refused to get on the bus. If Plaintiff were not shackled to this person it would be no need for him to be seated next to this person for the long bus ride. Sitting next to the transsexual/homosexual person was the same as being shackled to him.

42. Plaintiff would have been force to be seated next to the transsexual/homo-sexua1person for six to eight uncomfortable hours. Plaintiff did not want to violate his religious belief, and be stressed out for not adhering to his religious dogma.

43. Plaintiffs religious belief comes from the Holy Bible, and the way his mother raised him. In the book of Leviticus chapter 18 verse 22 through 26states that, "you shall not lie with a male as with a woman; it is an abomination.. ." There are many other verses in the Bible such as this one that forbid homosexual acts and association. Jamaican parents who were strict with the teachings of the Bible raised plaintiff. Also, the Jamaican people when Plaintiff was growing up took anti-homosexual stance very serious, because of what the Holy Bible states regarding any homosexual activities. God did destroy Sodom and Gomorrah,

because of the abundance of homosexual abomination that was occurring in these two cities.

44. Plaintiff stated his religious concerns to both defendants LaFrance and Foster, but they were hell bent on violating Plaintiffs religious beliefs.

45. Plaintiff was escorted back to SHU, and the next day, July 22, 2003 was issued a bogus fabricated misbehavior report written by defendant M. Foster.

46. Defendant Foster fabricated that Plaintiff stated that he "wasn't gonna be shackled to any Homo". And also said, "You guys might be Homo's, but I'm not and you ain't putting me with that Homo". Plaintiff never said any of these alleged quotes. At all time during the incident Plaintiff calmly, clearly and respectfully expressed his religious position to defendants LaFrance and Foster regarding his religious belief and the reason why he did not want to be shackled to the transsexual/homosexual person. At no time did Plaintiff verbally harass or abuse anyone. These defendants asked Plaintiff to be shackled to get on the bus; they did not give a direct order. Either way Plaintiff would have still stand on his religious rights and beliefs to not be shackled to the transsexual/homosexual person.

47. There were other inmates that were associating with the transsexual/homosexual while in the pen that would have been willing to be shackled to this person.

48. Plaintiff was found guilty at the disciplinary hearing by the H.O., and sentenced to four (4) months SHU with loss of all privileges, and sixty (60) days was suspended and deferred.

49. Plaintiff submitted an administrative appeal. The hearing disposition was reversed and expunged on administrative appeal after Plaintiff completed his SHU sentence. In all Plaintiff did sixty-one (61) days in SHU due to the fabricated misbehavior report written by defendant Foster and endorsed by defendant LaFrance.

In his Deposition, Livingston testified:

Q      Okay. I'm going to turn now to the events that you've included in this Complaint that occurred on the date of July 21st, 2003, at Upstate Correctional Facility.

Could you please describe what. happened on July 21st, 2003?

A      Well, I got -- I was escorted to the receiving room to be processed to be released from S.H.U. Upstate, and at one point I saw that the Sergeant wanted me to be handcuffed to this inmate that was, say -- he was a transsexual. Like -- I don't know. He had -- he had fake breasts or whatever you want to call it, and he made himself  up to look like a girl -- female or whatever. And I told the Sergeant I don't want to be handcuffed to this dude right here, and I told him the reason why, and he tried to force me to still. I told him, no, I'm not going to. And

he -- after going back and forth, I still told him I refused, and he got on the phone. He spoke to somebody. And he came with an alternative way to be -- to be placed on the bus, but it was still something to do with being handcuffed to the dude. And I told him no. So he said well, you know, you get put back in your cell. I said: If that's how it's going to be, that's how it was going to be. It's my religious right not to be forced to be handcuffed to this person. That's what I told him.  So they put my back in my cell and wrote me a force ticket saying this and that happened, when none of that happened in the ticket. And I went to a hearing. They found me guilty. And I appealed it, and they found in my favor.

Q      So the ticket was ultimately reversed?

A      Yes.

Q      Who first gave you the order to be handcuffed to this transsexual inmate?

A.      I think it was LeFrance 'cause I turned to him after I saw what was -- what was taking place, I turned to him and said: I'm not gonna be handcuffed to this person right here.

Q      And what did LeFrance do?

A      He said if you want -- he said -- he said something like if you want to get on the bus you are. And I said I'm not, and we went back and forth with it. And I told him the reason why, and he still didn't care. And I told him, well, I refused. And he made a phone call to somebody.

Q      Did LeFrance give you a direct order to be handcuffed to the transsexual inmate?

A      You could probably say it was an order, but I still wasn't going to.

Q      And you refused the direct order?

A      If it was an order, I refused it.

Q      And you refused to obey the direct order on religious grounds

A      Yes.

Q      And what are those religious grounds

A      Not to be in close proximity and interactive with persons of that persua-sion.

Q      And is that part of your Rastafarian beliefs?

A      It's my belief. It comes out of the Bible. I  think I sited [*sic*] the place in the Bible where it states Leviticon -- Leviticus.

Q      In Paragraph 71 of your Complaint you correctly note that you cite Leviticus 18[:]22 through verse 26. Do you know what that verse states?

A        Not verbatim.

Q        Could you summarize it for me?

A        Basically what I just said about, yon know, being associated, proximity, interaction, you know, with persons like that person was.

Q        And did you cite this verse to Sergeant LeFrance?

A        No. But I told him that's my religious belief not to be handcuffed to this person like that.

Q        Were you actually ever handcuffed to this other inmate?

A        No.

Q        So the only injury suffered as a result of the events of July 21st, 2003, is the ticket that was issued to you?

A        I had to do 61 days, and my religious belief was compromised.

Q        How was your religious belief compromised?

A        Because they wanted me -- to handcuff me to the person -- this person knowing that. And since I refused, they gave me 61 days because of my religious belief.

Q        So the injuries suffered was the 61 days in S.H.U.?

A        And my religious beliefs.

Q        In Paragraph 74 of your Complaint you say: Defendant M. Foster fabricated a misbehavior report stating that Plaintiff disobeyed a direct order, verbal harassment, and staff direction for movement.

        Why was the ticket fabricated?

A        Because in the description of the incident,  none of that happened. He said I start -- I don't remember what he wrote, but he's saying that I start yelling, screaming, and causing a scene and all kinds of stuff. But I never did that. All I stated was my religious belief and my reason for refusing to be handcuffed to this person. But he just made up lies, fabrication, and said all kind of stuff happened beside, you know, that really happened.

Q        A hearing was conducted on this incident?

A        Yes.

Q        What was your defense at the hearing?

A        That because of my religious belief I didn't want to be handcuffed to this person and none of the description of the incident was true.

Q        Did Defendant Foster give you a direct order?

A        Not that I remember. All I kept speaking to was the Sergeant because he was the one in charge. So all my verbal comments was directed to him.

A little later he further testified.

Q        Were you ever given an order to get onto the bus?

A        I guess so if -- 'cause that's what they was trying to do. It might not have been an order-order, but it was, you know, they wanted me to get on the bus.

Q        And did you refuse because of your religious beliefs?

A        Yes

Four facts emerge from Livingston's testimony.  First, he refused to be shackled or, alternatively, sit unshackled next to a person he described as being a transsexual or homosexual for transport between two prison facilities.  Second, his refusal was based upon his professed religious beliefs.  Third, his refusal to be shackled resulted in his not being transported and was, at the very least, the functional equivalent of refusing to obey a direct order.  Fourth, Livingston was subjected to disciplinary action for his failure to obey the order.

Livingston has the threshold burden of establishing that the action of which he complains substantially burdened his sincerely held religious belief. *Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir.2006).  Once Livingston has met this burden, the burden shifts to the Defendants to identify the legitimate penological purpose justifying impingement upon that right and that the burden is reasonable. *Id.*  In making the reasonableness determination, this Court must evaluate four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether Plaintiff had an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and  (4) the existence of alternative means of facilitating Plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Id.*, citing *Turner v. Safley*, 482 U.S. 78, 90–91 (1987).

 The question is twofold: what was believed and how was it burdened?  Livingston's belief in this case is that homosexuality is an abomination and that he should "not be in close proximity and interactive with persons of that persuasion."[9]  By his own admission Livingston

---

[9] In addressing Plaintiff's threshold burden, this Court starts with the assumption that Plaintiff's religious belief is sincerely held. *See Ford v. McGinnis*, 352 F.3d 582, 590 n. 8 (2d Cir.2003).

was not handcuffed nor was he forced to ride seated next to the homosexual/transsexual.  The burden he alleges imposed was that Foster issued him a fabricated misbehavior report and he was subjected to disciplinary action for refusing to be handcuffed to a homosexual/transsexual.

The fatal infirmity in Livingston's case against LeFrance is that there is no factual support for a finding that LeFrance infringed upon any religious belief.  He admits that he does not know and is only guessing that LeFrance ordered Foster to issue the ticket.  Other than to order him to be handcuffed to the homosexual/transsexual person and board a transport bus, which order Livingston admittedly refused to obey, LeFrance had no further direct or personal involvement in the incident.  While perhaps showing that LeFrance *attempted* to burden Livingston's religious beliefs, Livingston falls far short of establishing that LeFrance burdened them.  Moreover, even assuming LeFrance ordered the misbehavior report be issued, as discussed further below, it does not establish his liability.  LeFrance is entitled to judgment in his favor on the Thirteenth Cause of Action.

Livingston's action against Foster suffers from several infirmities.  The misbehavior report charged Livingston with disobeying a direct order, verbal harassment, and staff direction for movement.  Livingston claims the misbehavior report was fabricated.  The fabrication claimed by Livingston was in the description of his behavior, *e.g.*, "yelling, screaming, and causing a scene and all kinds of stuff."  What Livingston fails to contend is that he did not disobey an order or staff direction for movement.  Quite to the contrary, Livingston admits he refused to be handcuffed or sit next to the transsexual/homosexual for movement and as a consequence missed the movement.  Even accepting as true Livingston's conclusory allegation that the description was false, having admitted he refused to be handcuffed and board the bus, Livingston's conclusory assertion that the infraction of the rules with which he was charged was fabricated lacks factual foundation.[10/]

Plaintiff's only defense to the misbehavior report was the exercise of his religious beliefs was being infringed.  The question becomes whether being handcuffed or, alternatively, forced

---

[10/] The Court is not unmindful of the fact that Defendant's conviction of this charge was later reversed on appeal.  Not only is no reason shown for the reversal, but the fact that Livingston may have been exonerated on appeal does not render the misbehavior report "bogus" or "fabricated" in a case where he admits the facts that underlie the charges in the misbehavior report to be true.

to sit next to a homosexual/transsexual on a bus would substantially burden Plaintiff's religious beliefs.  It would not.  According to Plaintiff, being forced to sit next to a homosexual/trans-sexual for six to eight hours would have been uncomfortable and he would have been stressed out for not adhering to his religious dogma.  This case does not rise to level of those cases in which a substantial burden on religious tenets was found to exist.  Plaintiff was not denied the right to participate in congregate services (*Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir.1993); right to participate in a religious ceremony of his choice (separate Shia and Sunni services during Ramadan) (*Salahuddin v. Goord, supra*); denied a religious meal (*Ford v. McGinnis*, 352 F.3d 582, 594 (2d Cir.2003)); or forced to swear on a bible in church (*Doe v. Phillips*, 81 F.3d 1204, 1211–12 (2d Cir.1996)).  Plaintiff was simply going to be uncomfortable sitting next a person whom he believed to be a moral abomination.  This fits within those cases in which it can comfortably be said that is so peripheral to Plaintiff's religion that the burden is constitutionally *de minimis*.  *See Ford v. McGinnis, supra*, 352 F.3d at 593.  Moreover, nowhere has it been clearly established that no matter how strongly or sincerely held his religious beliefs may be, a prison inmate has the right to be free from being in the proximity of or interactive with another person because of that person's sexual orientation.  Indeed, such a rule, just as one founded upon color, creed, religious beliefs, gender, or national origin, would be repugnant to the strong public policy of this country and this Court declines to adopt such a rule.

Defendants argue that, assuming that the misbehavior report constituted an impermissible burden on his religious beliefs, Livingston is not entitled to recover because LeFrance and Foster have qualified immunity.  Under the doctrine of qualified immunity, *i.e.*, freedom from being sued, the court follows a two-step process: first was there a violation of a constitutional right and second was the right clearly established at the time of the violation. *Clubside, Inc. v. Valentin*, 468 F.3d 144, 152 (2d Cir.2006) citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "The relevant dispositive in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct is unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. at 202.  If the facts establish a violation, the inquiry becomes whether the evidence, when viewed in the light most favorable to plaintiff and all permissible inferences drawn in his favor, is such that no rational jury could fail to conclude that it was objectively reasonable for

the defendant to believe that he was acting in a fashion that did not violate a clearly established right. *Salahuddin v. Goord*, 467 F.3d at 273.

While a general right of a prisoner to freely exercise his religious beliefs, although subject to some restriction, was clearly established in 2003, the question is whether that right extended to Livingston's conduct.  *See, e.g., Shabazz v. Coughlin*, 852 F.2d 697, 700-701 (2d Cir.1988) (holding that while the right to attend religious services in general was clearly established, the right to group prayer and prayer in the yard was not).  As noted above, no such right as that claimed by Livingston in this case has been clearly established and defendants are entitled to qualified immunity.

LeFrance and Foster are entitled to judgment in their favor on the Sixth Count (Thirteenth and Fourteenth Causes of Action).

2.  *Abair, Salls, and Bouyea*.

In his affidavit Livingston testified:

50. On August 5, 2003 defendant D. Abair started denying Plaintiff his alterna-
tive/religious meals while in Upstate C.F. Plaintiff notified sergeant Trim, but
nothing was done about this problem. Plaintiff had to go hungry for the last two
chows (lunch & dinner). Plaintiff told defendant Abair that he have been getting
the religious/alternative since he arrived in Upstate C.F. on May 2, 2003. Defen-
dant Abair still refused to give Plaintiff his meal.

51. On August 6, 2003 again Plaintiff did not get his religious/alternative meals.
Plaintiff spoke to defendant S. Salls on the 7 to 3 shift about the problem. Plaintiff
had to go hungry because his meal was not given to him, and he did not eat meat
for religious reasons. When the 3 to 11 shift came on Plaintiff spoke to Sgt. Bass
about the problem, but nothing changed Plaintiff still had to go hungry.

52. On August 7, 2003 during the 7 to 3 shift Plaintiff again spoke to defendant
Salls twice. Defendant Salls told Plaintiff he wouldn't be getting the religious/al-
ternative meal until September 1,2003.

53. Plaintiff even spoke to the Muslim Iman [*sic*] Dr. Ali on August 7, 2003 about
him being denied his religious/alternative meal. Dr. Ali said he would tell some-
body about the problem. Plaintiff still did not get his meals.

54. On August 11, 2003 defendant J. Bouyea came back to work on A-gallery in
8- Building, for which he was the steady C.O. Plaintiff spoke to defendant
Bouyea about the problem of him not getting his religious/alternative meal.
Defendant Bouyea wrote the sign back on the door indicating that Plaintiff was to
get a religious/alternative meal. Defendant Bouyea told Plaintiff that he must have

"pissed off somebody for them to change his alternative meal to regular." Plaintiff
started getting his religious/alternative meal then.

55. On August 13, 2003 defendant Salls came to Plaintiff cell during feed-up time
and made defendant Bouyea change the religious/alternative meal tag on the cell
door to regular meal. Defendant Salls told Plaintiff he "will make sure you don't
get your religious meal." Plaintiff did not get his meal and he went hungry again.

56. On August 14,2003 defendant Salls came to Plaintiff on the pretense of
investigating him not get his allotted cell property. Defendant Salls tried to make
a mockery of Plaintiff situation. At one point defendant Salls told Plaintiff "you
just don't understand you are not getting anything."

57.     On August 14, 2003 defendant Bouyea refused to give Plaintiff his
religious/alternative meal during the lunch feed-up. Defendant Bouyea told
Plaintiff that defendant Salls said, "you not alternative, so you not getting it." It
was reported to the console that Plaintiff refused chow. Plaintiff still was not
getting his meals.

58. On August 17, 2003 Plaintiff was not feed [*sic*] at all because there was no
religious/alternative meals on the food cart for him. This was not reported to the
console to be recorded in the logbook.

59. On August 20,2003 Plaintiff spoke to Correction Lieutenant D. Phelix about
his meal being changed from religious/alternative to regular without him request-
ing the change. He said he would check into the situation. Plaintiff did this when
he was moved from 8-B-2cell to 8-A- 17cell.

60. On August 22, 2003 Plaintiff spoke to Correction Captain Bezio regarding
him not getting his religious/alternative meal. He told Plaintiff that defendant
Salls investigated the matter. Defendant Salls never investigated Plaintiff about
the food after August 7,2003. In fact, it was defendant Salls whom had Plaintiff
[*sic*] meal changed without consent or a request after the problem was corrected
on August 13, 2003 Plaintiff told this to Capt. Bezio.

61. On August 28, 2003 Plaintiff told Correction Captain Racette about the
problem he was having regarding not getting his religious/alternative meals, and it
being changed to regular meals without his request. Capt. Racette saw for himself
that the alternative meal sign on the cell door was scratched off with a black
marker and regular was written on the place card.

62. All of the discrepancies about Plaintiff's religious/alternative meals started
after he refused to be shackled to the transsexual/homosexua1 inmate on July 21,
2003. Which was a deliberate attempt to violate Plaintiff's religious beliefs.

63. The denial of Plaintiff [*sic*] religious/alternative meals was once again an
attempt to violate his religious beliefs. Because of Plaintiff's religious beliefs he

do not eat red meat, pork, crustaceans or fishes without scales. Plaintiff went hungry when red meat was served.

 In his Deposition Livingston testified in part:

Q         What are your religious dietary restrictions under Rastafarianism?

A         I don't eat any red meat and stuff like that.

Q         You're going to need to elaborate on what "stuff like that" is?

A         Just red meat and you know ...

Q         Do you eat other forms of meat?

A.        Yes.

Q         Chicken?

A         Yes, I eat chicken.

Q         Fish?

A         Fish.

Q         So it's basically just no red meat like --

A         Yes.

Q         -- beef?

A         Yes.  And I don't eat shrimps, crabs, oysters, and those things without scales and stuff like that.

Q         So no seafood?

A         No.  I eat seafood but certain seafood like unscaled seafood.  Like, you know, certain -- it's basically what the Bible said not to eat.  The Bible said not to eat unscaled fish and basically that's what I -- I don't eat shrimps, crabs and lobsters.

Q         I can't imagine that the Department of Correctional Services serves lobster too often.

A         They never do. But you can buy it, though.

Q         Really?

A         Yeah.

Q         Hmm.  And the dietary restriction of red meat and no unscaled seafood, is that a basic tenant of Rastafarianism?

A         That's how I grew up from my mother. My mother never cooked pork and stuff like that. That's one other thing. Unscaled fish, she never cooked those.

MEMORANDUM DECISION and ORDER
*Livingston v. Griffin*, No. 9:01-cv-00607-JKS                    28

Q        And is your mother a Rastafarian?

A.       No, she's Seven [*sic*] Day Adventist.  But she followed -- she just fol-
lowed the Bible strict, like, you know, as far as dietary things.

Q        So even though you converted to Rastafarianism, you kept the dietary
restriction of a Seven [*sic*] Day Adventist?

A        Basically.  It's basically the same thing, but they just follow the Old
Testament, you know, Torah and all that other stuff.

Q        Now, it was my understanding that Rastifarians are complete vegetarians;
is that true?

A        Some.  Some.

Q        Why have you chosen not to be a complete vegetarian?

A        Because I think I need some -- some of that, you know, protein and things.

Q        Now, in August of 2003, were you serving a S.H.U. sentence?

A        Yes, I think so. I think -- yeah, 2003.

Q        When you came into DOCS custody, did you inform them of your no red
meat dietary restriction?

A        At one point.

Q        When?

A        Every time that I went to the box or S.H.U. I informed them that, you
know, I'd like the alternative meal -- the religious meal.

Q        Now, how do you go about telling them that you want the alternative
meal?

A        You know, each facility prison, you know, verify how they want to be
told.  Some make you sign a paper -- documents that all you want is the alterna-
tive meal, and others they just ask you when you come in what kind of food you
want and you tell them.

Q        How does Upstate do it?

A        When I first went there in '01, I think it was I went there -- or '02 I told --
I signed a piece of paper before. But when I returned the most -- last one -- recent
one -- the most recent one I just told them. They just put it up on the door of the
cell that, you know, he eats alternative.

Q        And how about in '03, what was the process at Upstate?

A        '03, that's the most recent one. I think I told -- that's why I told them. I told
them -- the first time I went there, I had to sign a document saying I wanted the

religious meal. The last time I went there, they just put it on the door after I told them I only eat alternative meal.

Q.      And how do they put it on the door?

A.      They write it on a piece of paper and they have some magnets like, you know, you might use on your refrigerator to stick it up there on the metal door.

Q       And what's the difference between the regular meal and the religious alternative meal?

A       They don't serve meat. Soy beans and --

Q       So the religious alternative meal is completely vegetarian?

A       Yes. And fish.

Q       It includes fish, though?

A       Yes.

Q       And when you were in S.H.U., your meals are delivered to you?

A       Yes.

Q       And how many times a day are meals delivered to S.H.U. inmates?

A       Three times.

Q       And generally what would be in your breakfast?

A       Everybody get the same breakfast generally.  I can't -- it varies everyday; toast and hot cereal, cold cereal, coffee cake and jelly, milk, coffee if you drink coffee, juice.

Q       Is there ever any meat products in the breakfast?

A       If you consider eggs or they have some, I think, turkey sausages/links.

Q       And do you eat eggs under your religious dietary restriction?

A       Yes, I eat eggs.

Q       And do you eat turkey sausage as part of your religious --

A       I eat turkey.

Q       So any breakfast that was delivered to you would have complied with your religious dietary needs?

A.      Yes.

Q       What generally is in a lunch that was delivered to you in S.H.U.?

A       Non-meat.  Alternative -- on the alternative meal it's non-meat, that's all. But it varies from meal to meal.

Q       What about in the general -- the non-alternative meal, what would be included in that?

A       It varies too, but they have meat in theirs, most likely.

Q       Would there be non-meat products included in the lunch?

A       Like potatoes, and rice, and stuff like that?

Q       Yeah.

A       Mm-hmm.  Vegetables.  But the main course would be something with meat, most likely.  They also get chicken and fish, turkey.

Q       And for dinner on the non-alternative meal, what was generally served?

A       Basically the same thing; meat biproducts [*sic*] and carbohydrates, bread.

Q       So the main entree would have either chicken, fish or beef --

A       Right.

Q       -- and then there would be two sides --

A       Two sides.

Q       -- like a serving of vegetables?

A       Yeah.

Q       And then maybe a serving of potatoes and rice?

A       Yeah, dessert.  Mm-hmm.

Q       And bread?

A       Yes.

Q       You allege in your Complaint that from August 5th to August 11th, 2003, you had to go hungry when red meat was served.  How many times was red meat served to you in S.H.U. from August 5th to August 11th, 2003?

A       I didn't count but basically every day red meat is served.  Sometime it be mixed into it where you can't even, you know, separate and eat what's not red meat like potatoes or rice.

Q       What do you mean "every day red meat was served"?

A       Some kind of red meat was served -- I wouldn't say every day, but most days it would be red meat.  You know, beef, chopped beef, Salisbury steak, stuff like that.

Q       And which meal of the day, breakfast, lunch or dinner, could you not eat because it had red meat?

A      Probably the last two lunch and dinner.

Q      So you were always able to eat your breakfast?

A      Yes.

Q      And were there days when both lunch and dinner on the same day included red meat?

A      Yes.

Q      How many days was that?

A      I didn't count them, so I couldn't really give you a specific answer on that.

Q      Were there ever consecutive days in which both lunch and dinner included red meat?

A      Yes.

Q      How many?

A      I couldn't say.

Q      When you arrived at Upstate, who did you tell about your dietary restriction?

A      Officer on the gallery.

Q      Do you remember his name?

A      No.

Q      And when did you first arrive in S.H.U. at Upstate in 2003?

A      I think I got there May.

Q      And from May to August of 2003, you had no problems receiving your alternative meal?

A      No.  I think it was from May to July 'cause I was gonna get out in July on the 21st.  And then when I told them I didn't want to be handcuffed to that other inmate and they put me back into the cell, that's when all the problems started about my meal.

*   *   *   *

Q      But your only complaint was when the meal contained read meat?

A      My complaint is them not wanting to comply with my request for religious meal because that's what I was getting and they knew it.  And they just outright refused me because, I think, in retaliation of what they -- what I did when I said I didn't want to be handcuffed to that -- to that person.

*   *   *   *

Q       Did you ever complain to Officer Abair that he was denying you your religious meal?

A       Yes, I did.

Q.      When did you have this conversation?

A       At the time he denied it.

Q       And what did he say to you?

A       What did he say? Basically you're not getting it. You're not getting an alternative meal.  We went back and forth. I told him: I been getting it.  He said: You're not getting it now.  I said: Why not?  He didn't give me no reason.

Q       What are your claims again Defendant Bouyea?

A       Yeah. He started not giving me my alternative meal, also.

Q       When?

A       Shortly after that incident. Shortly after Abair started that and he knew. 'Cause when Abair started that, not giving me my alternative meal, he wasn't on. He was the steady officer.  And when he came back, he knew I was there for a while on that gallery, and he put the alternative tag back on my cell.  Because he knew, you know, since I been there I was getting the alternative meal.  And then about a week or so after, Sergeant Salls, S-A-L-L-S --

Q       Mm- hmm .

A       -- Salls told him to take it off right in front of me.  Take it off. Take that off the door, he's not getting it.  So he start not giving me my alternative meal.

Q       So who's the officer who was in charge of the gallery at Upstate S.H.U. that you were housed at in August and September 2003?

A       August?  That's when they moved me from one side to the other.  So I don't really know who was the officer that was in charge.  But on the gallery, on B Gallery  where I was before where this -- where it started, he -- that other officer who you said his name, he was the steady officer and he knew my dietary requirements.

Q       So in July of 2003, where were you housed?

A       In 8 Building, B Block, in Two Cell.

Q       And when you were going to be transferred out of Upstate in July of 2003, you had an incident with Officer LeFrance and Officer Foster, so you were not transferred out of Upstate; correct?

A       Yeah, I was -- yep, they sent me back to my cell.  That cell right there.

Q       So they sent you to the 8 Building, B Block?

A       No.  They sent me right back to the same cell, 8 Building, B Block, Two Cell.

Q       And was this the cell you were in from August 5th to August 11th, 2003?

A       August 5th to August 11th, 2003.  I might have the dates mixed up, but at one point they had moved me from A Building, B Gallery, Two Cell to A Block -- A Building, A Block -- A Gallery, 19 cell or something, if I'm not mistaken.

Q       And this is where you were denied your religious meals?

A       Most of the time.  But it was happening on the other gallery, too, before I got moved.

Q       And was it Officer Bouyea who was in charge of 8 Building, A Block --

A       B Block.

Q       B Block?

A       No, B Gallery.  It's 8 Building, B Gallery and the cell.  Yeah, he was the officer -- he was the main officer that was on.  Him and another officer.

Q       And just so I'm getting this straight, he was the officer in charge of the 8 Building or the A Building?

A       Eight. Eight. The number eight.

Q       Who was in charge of A Building?

A       I don't know.

Q       Did you see Officer Bouyea from August 5th, 2003, to August 11th, 2003?

A       Did I see him? Occasionally, yeah.  Mm-hmm.

Q       And did you complain to him that you weren't getting your religious meals?

A       He knew I wasn't getting my religious meals after that Sergeant told him to take the religious alternative meal that was posted on my door down.  That's when I stopped getting it again.

Q       Right.  And that's on August 13th, 2003.  But prior to that, from August 5th to August 11th, 2003, did you complain to Officer Bouyea that you weren't getting your religious meals?

A       Yeah.  Because when he came back to work.  'Cause before that -- before that, he wasn't on. But when he came back to work I was like -- I was telling him they stopped giving my religious meal, and I told him: You knew I 1was getting that before. And he said: Yeah. And then he put it back up. He post it back on the door, and I start getting it again. And then that's when Salls -- a Sergeant Salls

told him to take it down and not to give me no more -- give me the trays of the alternative meal anymore.

Q       How do you know Sergeant Salls told Officer Bouyea to take the sign off of your door?

A       Did it right in front of me.

Q       What did Sergeant Salls say?

A       He told him to take it down and don't give him no more alternative meal.

Q       Why did Sergeant Salls tell him to do that?

A       I don't know.

Q       So what are your claims again Officer Bouyea?

A       That he took -- he stopped giving me my alternative meal when he know that I was supposed to be getting it.

Q       Why do you think Sergeant Salls stopped giving you your alternative meals?

A       I think it came out of that incident that happened when I was getting transferred.  'Cause after that happened then, that's when all the things about my food started.  Before that incident, it was no problem getting my trays -- my food tray -- alternative food trays.  But after that incident, just all kinds of problems about that.

* * * *

Q       Now, after the sign was taken off of your door on August 13th, 2003, how long did you go without your alternative meals?

A       From then on I never got it until sometime in September.

Q       What happened in September?

A       After complaining to everybody that walked past, even writing complaints to the Superintendent and others, and they came up with an idea that I had to sign a request form for that kind of a meal, which I did, and they started giving me my meal -- the alternative meal again.

Q       Now, from August 13th to September 1st, 2003, the breakfast that was served always complied with your religious dietary restrictions?

A       I was able to eat, yeah.

Q       From August 13th to September 1st, 2003, how many lunches could you not eat because it had red meat?

A       I didn't count it.

MEMORANDUM DECISION and ORDER
*Livingston v. Griffin*, No. 9:01-cv-00607-JKS                    35

Q        More than one?

A        Yes.

Q        More than five?

A        Probably.

Q        More than ten?

A        Probably.

Q.       More than 15?

A        Probably.

Q        More than 20?

A        Probably.

Q        Sir, how many lunches were severed to you from August 13th to September 1st?

A        I don't know.  I didn't count.

Q        You get one lunch a day; correct?

A        Yep.  I still didn't count them.

Q        How many dinners were served to you from August 13th to September 1st, 2003?

A        I don't know.  I didn't count them.

Q        Well, you get one dinner a day; correct?

A        Right.  If you want to do math, probably could figure it out.

Q        And how many dinners had red meat?

A        I don't know.  Probably the majority of them had red meat, though. Sometimes there was fish and turkey, depending on the meal or the menu.

Defendants' argument is essentially twofold.  First, Defendants argue that Livingston's dietary restrictions are not central to his Rastafarian religion but are based upon his having been raised as a Seventh Day Adventist.  Therefore, Defendants argue his religious beliefs are not sincere.  Second, that Livingston did not inform the DOCS officials of his conversion to Rastafarianism until approximately one year after the incidents forming the basis for his claims. For the reasons that follow, the Court rejects those arguments.

Defendants' first argument is contrary to controlling authority.  In determining whether a prisoner's particular religious beliefs are entitled to free exercise protection, the relevant inquiry

is not whether, as an objective matter, the belief is accurate or logical, but whether the beliefs professed by a claimant are sincerely held and whether they are, in his own scheme of things, religious; a claimant need not be a member of a particular organized religious denomination to show sincerity of belief. *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir.1999). In the very case cited by Defendants in support of their argument, *Ford v. McGinnis, supra*, the Second Circuit rejected a narrow reading of *Jackson*. Instead, following *Frazee v. Illinois Department of Employment Security*, 489 U.S. 829, 832–33 (1989) (free exercise of religious beliefs does not turn on a membership in a particular sect or a particular tenet of the sect involved), *Ford* rejected any objective test in determining the sincerity of religious beliefs. 352 F.3d at 588-91; *see also Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir.1996); *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir.1984) ("differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud"). At best, Defendants' argument raises a triable issue of fact as to Livingston's sincerity.

Defendants' second argument rings hollow. First, there is no indication in the record that Livingston was denied alternative religious meals because of his failure to formally advise DOCS of his conversion to Rastafarianism until approximately a year later. Second, the testimony of Livingston that he advised the Defendants of his religious preferences is uncontradicted and there is no evidence that Defendants made any investigation into his claim. Third, and perhaps more importantly, the uncontradicted testimony of Livingston that, notwithstanding the lack of formal notification of conversion to Rastafarianism, he had received alternative religious meals prior to August 2003 eviscerates any suggestion that such formal notification was required. Moreover, even by his official stated religious belief as a Muslim, Livingston was entitled to receive alternative religious meal.

Abair, Salls, and Bouyea contend that they are entitled to qualified immunity. The Court disagrees. Not only have they failed to adequately develop that issue but they lose on the merits as well. As noted above, qualified immunity does not exist where there is a clearly established right and no reasonable officer could not be aware that his conduct violated that right. It was clearly established law in 2003 that prison inmates have a right to a diet consistent with the prisoner's religious scruples. *See Kahane v. Carlson*, 527 F.2d 492, 495–96 (2d Cir.1975).

MEMORANDUM DECISION and ORDER
*Livingston v. Griffin*, No. 9:01-cv-00607-JKS                37

Defendants have not advanced any legitimate penological justification for denying Livingston alternative religious meals and none appears from the record before this Court. Consequently, this Court rejects the qualified immunity argument of Abair, Salls, and Bouyea for the same reason as did the Second Circuit in *Ford*, 352 F.3d at 597 ("prior cases make it sufficiently clear that absent a legitimate penological justification, which for present purposes we must assume defendants were without, prison officials' conduct in denying [Plaintiff a meal consistent with his religious tenets] was unlawful."). *See also Salahuddin v. Goord*, 467 F.3d at 275.[11]

Abair, Salls, and Bouyea are not entitled to judgment as a matter of law on the Seventh Count.[12]

## VI.  CONCLUSION

Based upon the foregoing, Defendants' Motion for Summary Judgment at Docket No. 56 is GRANTED in part and DENIED in part.

IT IS ORDERED THAT the First, Second, Third, Fourth, Fifth, Tenth, Eleventh, Twelfth, Thirteenth, and Fourteenth Causes of Action are hereby DISMISSED, with prejudice.

IT IS FURTHER ORDERED THAT this action is DISMISSED, with prejudice in its entirety, as against Defendants P. Griffin, Donald Selsky, S. Gawlicky, G. LeFrance, and M. Foster.

Dated: May 21, 2007.

s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge

---

[11] Put another way, if the actions of Abair, Salls, and Bouyea did not infringe on Livingston's First Amendment free exercise right, there is no liability in any event and the Court need not reach the issue of qualified immunity. On the other hand, if those actions did, in fact, constitute violation of a clearly established First Amendment free exercise right, in the absence a legitimate penological justification Abair, Salls, and Bouyea are not entitled to qualified immunity.

[12] The Court notes that, as it appears he was following the orders of a superior, the liability of Bouyea is questionable. However, that argument has not been presented to the Court for consideration.